# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA TREHER, | ) | CASE NO. 1:23-CV-01399-JDA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | U.S. MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND** |
| SECURITY, | ) | **ORDER** |
| Defendant, | ) | |
| | ) | |

## I.      INTRODUCTION

Plaintiff, Cynthia Treher ("Ms. Treher"), seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her application for Disability Insurance Benefits ("DIB") (ECF No. 1.) This matter is before the Court pursuant to 42 U.S.C. §§ 405(g) and Local Rule 72.2(b). (ECF non-document entry dated July 20, 2023.) The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1. (ECF No. 5.) For the reasons set forth below, the Court AFFIRMS the Commissioner's final decision DENYING Ms. Treher's applications for DIB.

## II.      PROCEDURAL HISTORY

On January 1, 2021, Ms. Treher filed an application for DIB, alleging a disability onset date of June 1, 2018. (Tr. 17, 297-303.)[2] Her application related to fibromyalgia.[3] (Tr. 333.) The

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

[2] The administrative transcript ("Tr.") appears at ECF No. 4 on CM/ECF. All page number references to the administrative transcript herein are to the Bates numbers on the bottom right-hand corner. All other record references are to the electronically stamped CM/ECF document ("ECF No.") and PageID# rather than any internal pagination.

[3] Fibromyalgia is a disorder of unknown cause characterized by chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances. *Fibromyalgia*, Stedman's Medical Dictionary 331870 (Nov. 2014).

ALJ's decision also found a severe impairment of patellofemoral arthritis of the left knee, status-post arthroplasty. (Tr. 20.) Ms. Treher's application was denied initially and upon reconsideration. (Tr. 230-34, 241-45.)

Ms. Treher requested a hearing before an administrative law judge ("ALJ") on November 12, 2021. (Tr. 247-48.) The ALJ held a video hearing on May 27, 2022, at which Ms. Treher was represented by counsel. (Tr. 180-213.) Ms. Treher testified, as did an independent vocational expert ("VE"). (*Id.*) On August 15, 2022, the ALJ issued a written decision, finding that Ms. Treher was not disabled. (Tr. 17-31.) The ALJ's decision became final on June 27, 2023, when the Appeals Council declined further review. (Tr. 1-8.) Ms. Treher filed a Complaint on July 20, 2023, challenging the Commissioner's final decision. (ECF No. 1.) She raises one assignment of error:

(1) Whether the ALJ failed to properly evaluate the diagnosis of fibromyalgia pursuant to SSR 12-2p

(ECF No. 7, PageID#860.)

### III.    BACKGROUND[4]

#### A.  <u>Personal, Educational, and Vocational Information</u>

Ms. Treher was born in 1975, and she was 47 years old at the date of the administrative hearing. (Tr. 187, 297.) She is married and has three children. (Tr. 187.) Ms. Treher has a bachelor's degree in business. (Tr. 188.) She has a driver's license with no restrictions, but she testified at the administrative hearing that she only drives short distances. (*Id.*) Her past relevant work was employment as an office manager and instant print operator. (Tr. 29.)

---

[4] Because Ms. Treher's sole assignment of error deals with her fibromyalgia, this Background will be limited to the evidence related to that impairment.

### B.  **Relevant Non-Medical/Medical Opinion Evidence**

#### 1.  *State Agency Findings*

In April 2021, Lynne Torello, M.D., reviewed the record at the initial level of consideration. Dr. Torello opined that Ms. Treher could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; never climb ladders, ropes, or scaffolds; and occasionally climb ramps or stairs, kneel, crouch, or crawl. (Tr. 218-19.) In October 2021, Steve McKee, M.D., reviewed the record at the reconsideration level and reached the same findings as Dr. Torello. (Tr. 226-27.)

#### 2.  *Christopher Bechtel, MD*

Following Ms. Treher's left arthroplasty procedure, Dr. Bechtel indicated that Ms. Treher could engage in weightbearing as tolerated on her left lower extremity. (*See* Tr. 410, 415.)

#### 3.  *Jessica Woloszyn, CNP*

The ECOG Performance Status Scale is a numbering scale, commonly used by physicians in cancer clinical trials, that is used to track changes to a patient's level of functioning as a result of treatment during the trial. *See ECOG Performance Status Scale, ECOG-ACRIN*, https://ecog-acrin.org/resources/ecog-performance-status/ (last visited June 7, 2024). From May 2021 through April 2022, Ms. Woloszyn assigned Ms. Treher an ECOG performance status of either "0" (Tr. 599, 762, 773) or "1" (Tr. 767). An ECOG performance status of "0" means "[f]ully active, able to carry on all pre-disease performance without restriction," *Id.* A status of "1" means "[r]estricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, *e.g.*, light house work, office work." *Id.*

### 4.  *Jacqulyn Stachowiak, CNP*

In October 2021, Ms. Stachowiak – a family medicine nurse practitioner – opined that Ms. Treher could frequently lift 5 to 10 pounds; stand/walk for 10 minutes without interruption; sit for 30 minutes without interruption; rarely climb, balance, stoop, crouch, kneel, crawl, push/pull, or engage in gross manipulation; occasionally reach or engage in fine manipulation; and had environmental restrictions involving moving machinery and temperature extremes. (Tr. 747-48.) Ms. Stachowiak further opined that Ms. Treher must be able to alternate positions between sitting, standing, and walking at will but did not need to elevate her legs at will. (Tr. 48.) Ms. Stachowiak indicated the severity of Ms. Treher's pain depended on her activity and opined that her pain interfered with concentration and caused her to be off task and absent from work. (*Id.*)  Ms. Stachowiak also opined that Ms. Treher required unscheduled rest periods lasting six hours during an eight-hour workday outside of the standard 30-minute lunch break and two 15-minute breaks. (*Id.*) Regarding the medical findings that supported this opinion, Ms. Stachowiak merely noted "fibromyalgia." (Tr. 747-48.)

In March 2022, Ms. Stachowiak opined that Ms. Treher could lift and/or carry "any" pounds occasionally and frequently, and she stated that the weight of the object did not matter because Ms. Treher could not even hold her fork without pain after 45 seconds. (Tr. 751.) She opined that Ms. Treher could stand/walk only in 10-minute intervals due to "subjective findings: foot cramping, feet [and] ankle swelling after 10 minutes of standing, extreme pain of hips, elbows, hands, feet, back after sitting 40 minutes," and could only sit in 40-minute intervals due to extreme pain in her hips, elbows, feet, ankles, and back. (*Id.*) Ms. Stachowiak opined that Ms. Treher could rarely engage in fine and gross manipulation, occasionally balance, and rarely climb, stoop, crouch, kneel, crawl, reach, and push/pull because all activities caused pain after 45 seconds. (Tr.

751-52.) She opined that Ms. Treher had environmental restrictions involving moving machinery. (Tr. 752.) Ms. Stachowiak further opined that Ms. Treher must be able to alternate positions between sitting, standing, and walking at will but did not need to elevate her legs at will. (*Id.*) Ms. Stachowiak indicated Ms. Treher had severe pain that interfered with concentration and caused her to be off task and absent from work. (*Id.*) Ms. Stachowiak opined that Ms. Treher required unscheduled rest periods every 10 minutes during an 8-hour workday outside of the standard 30-minute lunch break and two 15-minute breaks. (*Id.*)

### C. Relevant Medical Evidence

On July 26, 2018, Ms. Treher complained of "all over" joint pain and achiness, which made standing all night at work very difficult. (Tr. 608.) Ms. Stachowiak indicated that Ms. Treher appeared absent of distress or pain, and had appropriate grooming and hygiene, normal motor function and sensation, and no focal neurological deficits. (*Id.*) No fibromyalgia tender points[5] were noted. (*Id.*) Ms. Stachowiak prescribed medication. (Tr. 608-09.)

On September 6, 2018, Ms. Treher returned to see Ms. Stachowiak. (Tr. 610.) Ms. Treher reported she was seeing a rheumatologist, whose work up was negative. (*Id.*) Ms. Stachowiak indicated that her rheumatologist told her that she must have symptoms for another three months (totaling six months) in order to be diagnosed with and treated for fibromyalgia; however, she stated that she could not tolerate her pain for that long. (*Id.*) She reported that doing anything caused pain and noted that she dropped things if she did not pay attention. (*Id.*) She stated that she had been going to yoga daily, had acupuncture, took methocarbamol, and engaged in cardio exercise, but nothing helped. (*Id.*) Ms. Stachowiak indicated that Ms. Treher appeared very upset

---

[5] Tender points, sometimes called trigger points, are specific sites on the body that cause pain in a larger area when pressed. *See Fibromyalgia Tender Points*, NEW YORK PRESBYTERIAN HOSP., https://www.nyp.org/healthlibrary/multimedia/fibromyalgia-tender-points (last visited June 12, 2024).

and was crying, but had appropriate grooming and hygiene, normal range of motion and strength in the extremities, normal motor function and sensation, and no joint swelling or focal neurological deficits. (Tr. 611.) No fibromyalgia tender points were noted. (Tr. 610-11.) Ms. Stachowiak prescribed medication and referred Ms. Treher to a different rheumatologist. (*Id.*)

On September 14, 2018, Ms. Treher met with Gheroghe Ignat, M.D., a rheumatologist. (Tr. 383.) Ms. Treher reported that Cymbalta provided some relief of her symptoms but caused blurred vision on the most recent doses. (*Id.*) Examination revealed 17/18 fibromyalgia tender points, but Ms. Treher was in no acute distress with normal motor strength and sensation, normal range of motion of the spine and the joints in her arms and legs except for her left knee, and no focal neurological deficits. (Tr. 383-84.) Dr. Ignat adjusted her medications and referred Ms. Treher to water therapy and cognitive behavioral therapy. (Tr. 383.) Ms. Treher returned to Dr. Ignat the following month and reported no improvement of her symptoms. (Tr. 380.) Her examination was unchanged. (Tr. 380-81.) Dr. Ignat again adjusted Ms. Treher's medications. (Tr. 380.)

On November 26, 2018, Ms. Treher told Ms. Stachowiak that rheumatology and neurology had not been able to come up with a plan that worked for her. (Tr. 612.) Ms. Stachowiak observed that Ms. Treher appeared tearful but had appropriate grooming and hygiene; normal range of motion and strength in the extremities; normal motor function and sensation; and no joint swelling or focal neurological deficits. (*Id.*) Ms. Stachowiak prescribed medications. (Tr. 613.) On December 12, 2018, Ms. Treher complained of constant pain and insomnia. (Tr. 614.) She reported that she was very anxious about flying on an airplane the next week for a family vacation because she did not know how she would be able to sit that long. (*Id.*) Ms. Stachowiak observed that Ms. Treher had appropriate grooming and hygiene but appeared to be in moderate discomfort and was

crying. (*Id.*) Ms. Treher had normal range of motion and strength in the extremities with no joint swelling. (*Id.*) No fibromyalgia tender points were noted. (*Id.*) Ms. Stachowiak prescribed medications. (*Id.*)

On January 22, 2019, Ms. Treher was referred to Dr. Christopher Bechtel, an orthopedic surgeon, for an evaluation of possible patellofemoral arthroplasty. (Tr. 539.) Her history noted a patellar dislocation that resulted in large osteochondral fragments that fractured. (*Id.*) Despite surgical intervention and debridement, Ms. Treher still experienced significant anterior knee pain. (*Id.*) Other conservative measures such as physical therapy provided no relief. (*Id.*) Ms. Treher reported that she had severe pain that deteriorated her quality of life. (*Id.*) She could not sit, stand, walk, or climb stairs without difficulty, perform day-to-day activities, or sleep. (*Id.*) On examination of Ms. Treher's left knee, Dr. Bechtel observed a healed slightly medial anterior incision, some hypersensitivity to pain over the knee, positive crepitus, pain with deep palpation over the medial and lateral aspects of the patella, pain with retropatellar grind test, and minimal medial and lateral aspect of the patella, but 5/5 strength in the left lower extremity. (Tr. 540.) Imaging did not show any significant medial or lateral degenerative changes but did show irregularities over Ms. Treher's patellofemoral joint and at the articular surface of the patella, and some joint space narrowing, osteophyte formation, and subchondral sclerosis with early subchondral cystic changes. (*Id.*) Dr. Bechtel recommended patellofemoral arthroplasty. (*Id.*)

On February 7, 2019, Ms. Treher underwent left knee arthroplasty. (Tr. 417.) In the days after the surgery, Ms. Treher experienced moderate pain, but ambulated with minimal assistance (Tr. 441, 443.) During subsequent follow-up appointments, Ms. Treher reported feeling "fantastic" and "very happy with the results of her surgery." (Tr. 542, 545.) At a six-month post-operative visit on August 6, 2019, Ms. Treher reported that she had been able to resume almost all the

recreational activities that she had not been able to do prior to her knee surgery, including biking, swimming, playing basketball with her sons, and using the elliptical machine. (Tr. 549.) She stated that she continued to go to the gym on a regular basis. (*Id.*)

On December 2, 2019, Ms. Treher told Ms. Stachowiak that she had been managing her pain with medical marijuana, and finally had long stretches of being pain free. (Tr. 620.) She reported that she continued to work out twice daily, and she noted that she felt great and had absolutely no pain at all when talking on a treadmill at a #10 incline. (*Id.*) She stated that her pain resumed after she sat or rested for too long. (*Id.*) Ms. Stachowiak observed that Ms. Treher appeared very positive and absent of distress or pain. (*Id.*) Ms. Treher had appropriate grooming and hygiene ad normal motor function. (*Id.*) No fibromyalgia tender points were noted. (*Id.*)

On March 21, 2019, Ms. Treher returned to Ms. Stachowiak. She reported a 50% reduction in whole body pain with daily physical therapy and higher doses of Gabapentin and Robaxin. (Tr. 616.) On July 2, 2019, Ms. Treher returned with a significant flare-up of pain caused by her fibromyalgia. (Tr. 618.) She reported that going back to work threw off her regular exercise routine and resulted in increased pain. (*Id.*) She reported that she tried ketamine infusions, "many different medication regimens," salt baths, CBD oil, marijuana, and treatment with a neurologist, rheumatologist, and pain management specialist, but they did not provide lasting relief. (*Id.*) Ms. Stachowiak advised "that if the routine of exercise and her medication gave her relief so she can go about her day and function tolerably, then that seems like the goal she should be working towards at this time." (*Id.*)

On June 5, 2020, Dr. Bechtel indicated that Ms. Treher had been able to return to a very active lifestyle, which included walking approximately 10 miles per day. (Tr. 553.) On June 30, 2020, Ms. Treher saw Ms. Stachowiak and told her that she had adopted a new lifestyle routine of

consuming a low-calorie diet, walking 10 miles a day, and keeping her heart rate above 100. (Tr. 622.) She stated that this helped keep her pain at bay, and she had not needed to take pain medication or use medical marijuana since Easter. (*Id.*) Ms. Stachowiak observed that Ms. Treher appeared absent of distress or pain, and she described Ms. Treher's fibromyalgia as "stable, controlled with lifestyle and dietary changes." (*Id.*) No fibromyalgia tender points were noted. (*Id.*)

On January 26, 2021, Ms. Treher told Ms. Stachowiak that she had been working out five hours per day consistently, which allowed her to be pain-free from her fibromyalgia the next day. (Tr. 624.) She reported that she had been taking tizanidine and methocarbamol for her fibromyalgia and to help sleep, but these medications were not working well anymore. (*Id.*) Ms. Stachowiak described Ms. Treher as appearing absent of distress or pain with appropriate grooming and hygiene and moral motor function. (Tr. 624-25.) No fibromyalgia tender points were noted. (*Id.*) Ms. Stachowiak described Ms. Treher's fibromyalgia as stable on her stringent exercise routine. (Tr. 625.)

On April 26, 2021, Ms. Treher returned to see Ms. Stachowiak to have disability paperwork completed. (Tr. 658.) Ms. Treher reported that she currently controlled her symptoms with medication and a rigorous exercise regimen, which normally consisted of walking three miles after waking up, followed by two separate 90-minute sessions at the gym. (*Id.*) She stated that frequent exercise and cardio activity seemed to control her pain the best out of all the forms of treatment she had tried. (*Id.*) Ms. Treher indicated that she was experiencing a flare of symptoms that morning because she had not yet had a chance to exercise. (*Id.*) Ms. Stachowiak described Ms. Treher as tearful and in moderate discomfort with normal motor function (*Id.*) No fibromyalgia tender points were noted. (Tr. 658-59.) Ms. Stachowiak indicated that Ms. Treher's fibromyalgia was somewhat controlled with her exercise routine and medication. (Tr. 659.)

9

On April 27, 2021, Ms. Treher underwent a psychological consultative examination with Joseph Konieczny, Ph.D. Ms. Treher complained of significant pain from fibromyalgia for which she was taking medication, and she stated that running 10 miles a day was the only thing that kept her pain down. (Tr. 680-81.) She indicated that she ran three miles on her treadmill, ate breakfast, and then spent the remainder of the morning doing household chores. (Tr. 681.) She reported that she ran again before and after supper. (*Id.*) Ms. Treher reported that she drove only briefly due to pain but was regularly involved in social activities with friends and performed her own shopping tasks. (*Id.*)

Ms. Treher saw Amanda Meszaros, D.P.M., on August 3, 2021, for complaints of generalized body pain related to fibromyalgia. (Tr. 732.) Ms. Treher described her pain as sharp, twisting, and cramping. (*Id.*) She stated that her pain was worse with rest and prolonged standing and her only relief was when she was walking or running. (*Id.*) Ms. Treher reported that she walked five miles every morning and two to five miles in the afternoon. (*Id.*) Examination revealed generalized diffuse hyperesthesia with light touch and significant diffuse generalized pain to palpation of both lower extremities with normal reflexes, strength, and range of motion and no edema. (Tr. 733.) Dr. Meszaros recommended a physical therapy evaluation for possible desensitization therapy. (Tr. 734.)

On August 6, 2021, Ms. Treher attended a physical therapy evaluation. (Tr. 720-21.) The treatment notes indicated that Ms. Treher was "very active with fitness and recreational activity to maintain functional mobility." (Tr. 720.) Ms. Treher reported that her ability to perform daily activities was "greatly limited," unless she was consistently moving. (Tr. 721.) Her rehabilitation potential was noted to be good. (Tr. 721.)

Ms. Treher returned to see Ms. Stachowiak on March 23, 2022, to have disability paperwork completed. (Tr. 753.) Ms. Treher reported worsening symptoms of fibromyalgia with the need for some assistance with washing and curling her hair and using a speakerphone or headphones when talking on the phone due to difficulty holding the phone in her ear for more than 30 to 45 seconds. (*Id.*) Ms. Treher also reported difficulty holding eating utensils, pens, scissors, and other utensils that required the use of her hands. (*Id.*) She stated that she could not stand in one place more than 10 minutes and experienced extreme pain after about 40 minutes of driving in a car. (*Id.*) Ms. Treher reported that she could not lift any heavy objects that required gripping, struggled to push a vacuum over heavy carpet, and could not stand the sensation of water on her skin in the shower after five minutes. (*Id.*) Ms. Stachowiak described Ms. Treher as tearful and anxious with appropriate grooming and hygiene and normal motor function. (Tr. 754.) No fibromyalgia tender points were noted. (*id.*) Ms. Stachowiak referred Ms. Treher to neurology/rheumatology for another opinion regarding her fibromyalgia. (*Id.*)

### D. <u>Relevant Statements and Hearing Testimony</u>

#### 1. *Ms. Treher's Function Report*

In March 2021, Ms. Treher completed a Function Report. Ms. Treher stated that she found a "cure" that allowed her to be pain free, which was to keep her heart rate at a cardio level for a significant amount of time. (Tr. 342.) She reported that she walks three to four miles inside her house in the morning followed by doing dishes, vacuuming, and preparing lunch for her son. (Tr. 343.) She indicated that she spent three hours at the gym where she completed nine or more miles before coming home to prepare dinner and have family time. (*Id.*) She also reported that water touching her skin while bathing hurt, and she noted that her hands sometimes hurt so badly that she was unable to hold utensils. (*Id.*) She stated that her ability to perform household chores was

not affected if she had completed her exercise routine, and she performed housework between her gym times. (Tr. 344.) She reported that her hobbies and interests included hiking, kayaking, travelling, and spending time with her children. (Tr. 346.) She stated that the ability and frequency to do these things were "dependent on or around [her] gym routine." (*Id.*) She indicated that she could not walk with her heart rate "under cardio level" for very long, but she could walk with her heart rate at "cardio level" for at least eight miles. (Tr. 347.) Ms. Treher denied any change in her social activities since her illness began, and she indicated that she regularly went to the gym and her kids' school activities. (Tr. 346.)

### 2. *Hearing Testimony*

#### a. Ms. Treher's Testimony

Ms. Treher testified that she tried working at a job after her alleged disability onset date, but it did not involve enough cardio. (Tr. 189.) She stated she was not able to work due to her fibromyalgia, which constantly flared if she was not in "active cardio control." (Tr. 196, 207.) She testified that she could not clasp anything with her hands, had brain fog, and experienced pain with standing too long or having anything touch her skin. (Tr. 196, 198, 207-08.) She testified that her husband washed her hair because of her skin sensitivity. (Tr. 207.) Ms. Treher further testified that she must engage in cardio exercise to get her heart rate up in order to complete tasks, and she indicated that she alternated between exercising and completing tasks throughout the day. (Tr. 196, 199.) For example, Ms. Treher stated that she must run for two hours to be able to feed herself with utensils at dinner; otherwise, she would have to order food that could be eaten by using her hands. (Tr 196-97.) She also testified that she continually moves all day without sitting to keep her heart rate elevated over 110. (Tr. 198.) She testified that when she does so, she does not have pain. (Tr. 198, 206.) She testified that she walks at least 10 miles per day. (Tr. 198, 204.)

12

Ms. Treher testified that every form of treatment she tried in the past did not work, so she focuses on exercise. (Tr. 199, 209.) Ms. Treher described her typical day. She stated that she is stiff when she wakes up, so she begins her day by running, walking three miles, or biking, which allows her to take care of her personal care tasks. (Tr. 201-03.) After taking care of her personal tasks, Ms. Treher then again engages in cardio exercise to complete household tasks, such as vacuuming, doing laundry, and cleaning the dishwasher. (Tr. 202.) Ms. Treher testified that she can do these tasks for only two hours, but also later testified that she can do these tasks for only 30 minutes. (*Id.*) She testified that she then exercises at the gym for 60 to 90 minutes, gets things ready for dinner, and then goes to the gym for an hour. (Tr. 202-03.) She testified that, if she cooked, she does not make anything that required her to use utensils. (Tr. 204.)

### b. Vocational Expert's Testimony

The VE testified that Ms. Treher's past relevant work was employment as an office manager and instant print operator. (Tr. 210.) The ALJ asked whether an individual with Ms. Treher's age, education, and work experience could perform work at the light exertional level if additionally limited to occasionally climbing ramps and stairs; never climbing ladders, ropes, and scaffolds; and occasionally kneeling, crouching, and crawling. (*Id.*) The VE opined that this individual could perform past relevant work as an office manager. (*Id.*) The VE further opined that this individual could perform other jobs such as employment as a cashier II, marker, and officer helper. (Tr. 211.)

Ms. Treher's counsel asked the VE whether the individual from the ALJ's hypothetical individual could perform work if also limited to occasionally handling and fingering. (Tr. 211.) The VE stated that this additional restriction would preclude the individual from performing past relevant work and work at the light and sedentary exertional levels. (*Id.*)

Ms. Treher's counsel then asked what an employer's tolerance for absenteeism and off-task behavior would be. (*Id.*) The VE opined that an individual could be absent no more than one day per month and off task no more than 10 percent of the workday. (Tr. 211-12.)

## IV.    ALJ'S DECISION

The ALJ first determined that Ms. Treher meets the insured status requirements of the Social Security Act through December 31, 2023. (Tr. 19.) The ALJ then determined that Ms. Treher has not engaged in substantial gainful activity since June 1, 2018, the alleged disability onset date. (*Id.*) The ALJ further determined that Ms. Treher has the following severe impairments: fibromyalgia and patellofemoral arthritis of the left knee, status-post arthroplasty. (Tr. 20.) The ALJ, however, found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1.

The ALJ found that Ms. Treher had the residual functional capacity ("RFC") to perform light work except that she can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally kneel, crouch, and crawl. (Tr. 20-28.) The ALJ then found that Ms. Treher is capable of performing her past relevant work as an office manager, and that this work does not require the performance of work-related activities precluded by her RFC. (Tr. 29-30.) Accordingly, the ALJ concluded that Ms. Treher was not disabled within the meaning of the Social Security Act since her alleged disability onset date through the date of the ALJ's decision. (Tr. 30.)

## V.    LAW AND ANALYSIS

### A.  Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r*

14

*of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. <u>Standard for Disability</u>

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

### C. <u>Analysis</u>

Ms. Treher argues that the ALJ failed to comply with SSR 12-2p in evaluating her fibromyalgia. Specifically, she contends that the ALJ provided only a "fleeting reference" to SSR 12-2p in her analysis and compounded this error by failing to implement meaningful restrictions that accommodated her widespread pain. (ECF No. 7, PageID#871-75.) For the following reasons, these arguments lack merit.

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* The ALJ must then evaluate the intensity and persistence of the individual's symptoms and determine the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources (such as family and friends). *Id.*

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.*

An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). But the regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248; *see also* SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ does not need to use any "magic words," so long as it clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it. *Id.*

Regarding fibromyalgia, the Sixth Circuit has recognized that this medical condition is a severe impairment. *Davila v. Comm'r of Soc. Sec.*, 993 F. Supp. 2d 737, 754 (N.D. Ohio 2014) (citing *Rogers*, 486 F.3d at 243)). However, application of the usual disability analysis is challenging because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patient present no objectively alarming signs." *Rogers*, 486 F.3d at 243; *see Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 989, 990 (N.D. Ohio 2003). Medical evidence confirming the severity of the claimant's alleged pain "almost never exists." *Anderson v. Comm'r of Soc. Sec.*, No. 1:18CV0070, 2018 WL 7199514, at *8 (N.D. Ohio Dec. 21, 2018) (citing *Davila*, 993 F. Supp. 2d at 755; *Swain*, 297 F. Supp. 2d at 990), *report and recommendation adopted*, 2019 WL 415244 (N.D. Ohio Feb. 1, 2019)).

Social Security Ruling ("SSR") 12-2p describes the criteria for evaluating whether a person has a medically determinable impairment of fibromyalgia. *Luukkonen v. Comm'r of Soc. Sec.*, 635 F. App'x 393, 398-99 (6th Cir. 2016). Under SSR 12-2p, a person has fibromyalgia if: (1) there is a history of widespread pain, in all quadrants of the body, that has persisted for at least 3 months (the pain may fluctuate in intensity and may not always be present); (2) at least 11 of 18 possible positive tender points are found on physical examination; and (3) there is evidence that other

disorders were excluded as possible causes of the pain. SSR 12-2p, 2012 WL 3104869, at *2-3. The claimant must satisfy all three of these elements to have a medically determinable impairment of fibromyalgia. *Id.* at *2.

Here, the ALJ indicated that she evaluated the fibromyalgia pursuant to SSR 12-2p. (Tr. 20.) The ALJ also noted that Ms. Treher's fibromyalgia was a severe medically determinably impairment "warranting accommodations within the residual functional capacity." (*Id.*) The ALJ then assessed that Ms. Treher retained the RFC to perform work at the light exertional level, except that she can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally kneel, crouch, and crawl. (*Id.*) Ms. Treher contends that the ALJ wrongfully "assert[ed] a negative inference or conclusion" from the normal objective findings in the record, while acknowledging her reported widespread pain symptoms. (ECF No. 7, PageID#873.) Specifically, she appears to argue that the ALJ wrongfully relied on the absence of objective findings corroborating her symptoms in assessing her fibromyalgia. (*See id.*) Yet, a review of the ALJ's decision and discussion of the evidence reveals that the ALJ fulfilled her obligation to consider all the evidence, in compliance with SSR 12-2p, and she drew reasonable conclusions regarding the limitations in Ms. Treher's physical RFC. This discussion included Ms. Treher's reported symptoms and activities of daily living, examination findings, treatment history/efficacy, medical opinions, and the state agency findings. (Tr. 20-28.)

The ALJ considered Ms. Treher's statements and the objective medical evidence. *See* 20 C.F.R. §§ 404.1529(c)(2),(4) (An ALJ must consider whether there are conflicts between a claimant's statements and the objective medical evidence.) The ALJ acknowledged Ms. Treher's complaints of "widespread pain symptoms" due to her fibromyalgia that dated as far back as the alleged disability onset date in June 2018. (Tr. 23.) The ALJ then noted that, "to [Ms. Treher's]

19

credit," Ms. Treher sought appropriate treatment for her symptoms, including primary care follow-up and treatment, medication therapy, physical therapy, and specialist intervention including rheumatology treatment. (Tr. 23; *see* Tr. 612.) The ALJ discussed examination findings indicating that Ms. Treher had no distress or pain; normal range of motion and strength in all extremities; no joint swelling or deformity; normal motor functioning; and no focal neurological deficits. (Tr. 23; *see* Tr. 612, 616-17.) While discussing these examination findings, the ALJ also acknowledged that Ms. Treher was tearful at times and had 17 out of 18 positive fibromyalgia trigger/tender points on the two occasions she saw Dr. Ignat. (Tr. 23; *see* Tr. 380-81, 383-84, 616-17.) Although not wholly irrelevant, the lack of objective exam findings is of limited value in assessing a claimant's subjective fibromyalgia complaints. *Kalmbach v. Comm'r of Soc.*, 409 F. App'x 852, 864 (6th Cir. 2011). But the ALJ did not over-rely on these objective exam findings to discount Ms. Treher's subjective symptom complaints and instead considered the entire longitudinal record.

Besides assessing Ms. Treher's statements and the objective medical evidence, the ALJ also considered Ms. Treher's treatment regimen. *See* 20 C.F.R. §§ 404.1529(c)(3)(v)-(vi) (An ALJ must consider treatment, other that medication and any other measures used to relieve pain or other symptoms). In discussing Ms. Treher's treatment regimen, the ALJ discussed evidence indicating that Ms. Treher's rheumatology and neurology providers had no effective treatment plan for her. (Tr. 23; *see* Tr. 612.) The ALJ noted evidence indicating that Ms. Treher's pain management regimen include a ketamine infusion, oral medications, and medical marijuana with the need for one of her medications to be discontinued due to side effects. (Tr. 23; *see* Tr. 381, 612, 616, 618, 620.) The ALJ observed that Ms. Treher reported some symptom relief from her treatment regimen at times, including reporting feeling "great" with 50 percent reduction in her fibromyalgia pain symptoms on her medication regimen in December 2018, doing well for several months on daily

exercise and medication regimen in July 2019, and being pain free for "long stretches" on a regimen that included using medical marijuana and working out twice every day in December 2019. (Tr. 23; *see* Tr. 616, 618, 620.)

The ALJ also observed that Ms. Treher reported in June 2020 that she kept her fibromyalgia symptoms at bay with a regimen on walking 10 miles daily and keeping her heart rate over 100, and she had not needed to take any pain medications or use medical marijuana since Easter 2020. (Tr. 23, 25; *see* Tr. 622.) Notably, the ALJ even acknowledged that Ms. Treher reported that her medications were no longer helping her fibromyalgia symptoms, though she continued to consistently exercise for five hours per day to manage her pain symptoms. (Tr. 23; *see* Tr. 614.) The ALJ also observed that Ms. Treher reported that she treated her fibromyalgia pain symptoms exclusively with exercise. (Tr. 24; *see* Tr. 199.)

The ALJ, however, noted that although Ms. Treher reported her medications were no longer helping her in January 2021, Ms. Stachowiak, the examiner at the time, described Ms. Treher's fibromyalgia symptoms as stable, provided that Ms. Treher continued to exercise. (Tr. 23; *see* Tr. 625.) The ALJ stated later in her decision that Ms. Treher's treatment records showed that, "with appropriate treatment, including medication therapy, use of medical marijuana, and regular exercise, the claimant had [a] positive response to treatment, and her fibromyalgia symptoms were generally stable." (Tr. 25; *see* Tr. 620, 622, 624.) Ms. Treher does not establish how it was unreasonable for the ALJ, considering the longitudinal record, to determine that Ms. Treher's fibromyalgia was "either improving, or at worst, stable." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (finding that ALJ properly discounted claimant's subjective complains where the medical evidence indicated that, rather than progressively worsening, the claimant's symptoms of fibromyalgia were either improving or stable); *Jones v. Comm'r of Soc.*

*Sec.*, No. 1:23-cv-261, 2023 WL 7224762, at *14 (N.D. Ohio Sept. 29, 2023) (finding no error in ALJ's SSR 12-2p analysis where the ALJ considered the longitudinal record, not just the objective findings, and reasonably concluded that claimant's fibromyalgia was either improving or stable), *report and recommendation adopted*, 2023 WL 7222848 (N.D. Ohio Nov. 2, 2023); *Barger v. Comm'r of Soc. Sec.*, 2022 WL 2610486, at *22 (N.D. Ohio Apr. 21, 2022) (same), *report and recommendation adopted*, 2022 WL 2841877 (N.D. Ohio July 21, 2022).

The ALJ also discussed Ms. Treher's reported daily activities. *See* 20 C.F.R. § 404.1529(c)(3)(1); *see also Temples v. Comm'r of Soc. Sec.,* 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible). Specifically, the ALJ observed that Ms. Treher reported an exercise regimen that included working out twice every day in December 2019; walking 10 miles daily in June 2020; exercising for 5 hours per day in January 2021; walking 3 miles around her home and doing two separate 90-minute gym sessions daily in April 2021; and walking a minimum of 10 miles per day in May 2022. (Tr. 23-24; *see* Tr. 198, 620, 622, 624, 658.) Ms. Treher contends that the ALJ was "hyper-focused" on Ms. Treher's exercise regimen. (ECF No. 7, PageID#875) and appears to dismiss the ALJ's entire analysis. Despite activities of daily living being an appropriate factor to consider in assessing a claimant's subjective complaints, Ms. Treher's exercise regimen was *not* the sole factor the ALJ considered in analyzing Ms. Treher's subjective complaints and formulating the RFC.

In assessing Ms. Treher's functional limitations from fibromyalgia, the ALJ also considered the relevant medical opinions and state agency findings. The ALJ determined that the opinion evidence was "somewhat inconsistent with the claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms." (Tr. 24.) The ALJ noted that Ms.

22

Stachowiak opined that Ms. Treher had work-preclusive limitations, while the state agency consultants opined that Ms. Treher could perform a limited range of light work and Dr. Bechtel and Ms. Woloszyn opined that Ms. Treher did not have work-preclusive limitations. (Tr. 24; *see* Tr. 21819, 226-27, 410, 415, 747-55, 762, 767, 773, 790, 802.)

Specifically, the ALJ assessed the state agency findings from Drs. Torello and McKee, who both considered evidence pertaining to Ms. Treher's fibromyalgia and concluded that she could sustain a range of light work activity. (Tr. 25-26; *see* Tr. 215-19, 223-27.) The ALJ found the state agency findings persuasive, noting, in relevant part that Drs. Torello and McKee found Ms. Treher could perform work at the light exertional level except she could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; and occasionally kneel, crouch, and crawl. (*Id.*) The ALJ found the state agency findings consistent with the record as a whole, including Ms. Treher's physical examination findings (which documented positive fibromyalgia tender/trigger points), as well as her testimony and evidence from her treatment notes indicating that her fibromyalgia pain symptoms were stable with appropriate exercise and physical activity. (Tr. 26.) The ALJ accounted for these limitations in her RFC determination. *See* 20 C.F.R. § 404.1513a(b)(1) (An ALJ must assesses the state agency findings "according to [20 C.F.R.] §§ 404.1520B, 404.1520c, and 404.1527, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation.")

The ALJ also considered the opinions of Dr. Bechtel, Ms. Treher's orthopedist, that Ms. Treher could engage in weight bearing as tolerated, and Ms. Woloszyn, her oncologist, that Ms. Treher had an ECOG score of zero, which is indicative of being fully active, and able to ccary on all pre-disease performance without restriction. (Tr. 26-27; *see* Tr. 410, 415, 599, 762, 767, 773,

790, 802.) The ALJ, however, found these opinions only "somewhat persuasive" because they appeared to only account for Ms. Treher's left knee impairment and low-grade B-cell lymphoma, respectively, and did not account for Ms. Treher's fibromyalgia, which warranted additional limitations.

The ALJ also considered Ms. Stachowiak's opinions that Ms. Treher had limitations consistent with an inability to sustain work on a regular and continuing basis. (Tr. 27-28; *see* Tr. 747-56.) The ALJ found Ms. Stachowiak's opinions not persuasive for several reasons. (Tr. 28.) First, the ALJ acknowledged that Ms. Stachowiak is an acceptable medical source and had knowledge and understanding of Ms. Treher's longitudinal treatment history and response to treatment. (*Id.*) However, the ALJ observed that Ms. Stachowiak's October 2021 opinion was merely a checkbox form opinion, with little to no explanation for its findings. (Tr. 28; *see* Tr. 747-48); *see, e.g.*, *Marks v. Comm'r of Soc. Sec.*, No. 1:16-CV-02848, 2018 WL 1801609, at *8 (N.D. Ohio Jan. 12, 2018) ("Numerous decisions have found that the use of checklist or check-the-box forms in which the doctor provides little or no accompanying explanation for the assessed limitations…are unsupported and, therefore, the ALJ may properly discount the treating source opinion."). The ALJ also stated that Ms. Stachowiak's March 2022 opinion appeared to be based largely on Ms. Stachowiak's subjective statements. (Tr. 28; *see* Tr. 751); *see* 20 C.F.R. § 404.1529(a) ("However, statements about your pain or other symptoms will not alone establish that you are disabled.").

Finally, the ALJ found that Ms. Stachowiak's October 2021 and March 2022 opinions were inconsistent with each other and with Ms. Stachowiak's treatment notes and testimony. (Tr. 28; *see* Tr. 751-55.) The ALJ noted, for example, that the significant limitations in standing and/or walking that Ms. Stachowiak opined were not consistent with Ms. Treher's testimony and reports

24

to providers that she walked a minimum of 10 miles per day and "spent her days engaged in rigorous exercise and physical activity to keep her heart rate up." (Tr. 28.); *see* 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the record from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.").

After discussing Ms. Treher's symptoms and treatment history, the effectiveness of her treatment, a statement from a treating provider that her fibromyalgia was stable, her activities of daily living, and the medical opinions and state agency opinions, the ALJ acknowledged that Ms. Treher "has been subject to a degree of pain and functional limitations," and reasonably found that Ms. Treher's fibromyalgia symptoms limited her to light work with postural restrictions. (Tr. 20, 24); *Anderson*, 2018 WL 7199514, at *9 ("It is proper for an ALJ to make a finding on the credibility of a claimant's statements regarding the limiting effects of her fibromyalgia based on a consideration of the entire record."); *Murphy v. Comm'r of Soc. Sec.*, No. 1:18-CV-02602, 2019 WL 7944403, at *13 (N.D. Ohio Oct. 3, 2019), *report and recommendation adopted*, 2019 WL 6463392 (N.D. Ohio Dec. 2, 2019) (rejecting claimant's argument that the ALJ erred in evaluating fibromyalgia based on the absence of objective findings in reaching her decision where ALJ also considered claimant's subjective complaints of pain and fatigue and the state agency findings); *see also Luukkonen*, 2016 WL 3426370, at *5.

Ms. Treher highlights evidence that she argues demonstrates that her fibromyalgia and its associated pain warrant greater limitations. But a mere feasible alternative interpretation of the evidence does not demonstrate a basis for remand. *See Johnson v. Comm'r of Soc. Sec.*, No. 1:22-CV-02272-BYP, 2023 WL 8283922, at *14 (N.D. Ohio Nov. 9, 2023), *report and recommendation adopted*, 2023 WL 8281461 (N.D. Ohio Nov. 30, 2023). Instead, Ms. Treher

25

must establish that no reasonable person could have agreed with the ALJ's findings. *See Rogers*, 486 F.3d at 241. Even if there is substantial evidence supporting the opposite conclusion, this Court must affirm so long as substantial evidence supports the ALJ's decision. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). The Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Here, Ms. Treher does not meet that burden. Nor does she establish a compelling reason to disturb the ALJ's SSR 16-3p analysis. *Baumhower*, 2019 WL 1282105, at *2.  Accordingly, this assignment of error lacks merit.

## VI.    CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's final decision DENYING Ms. Treher's applications for DIB.

**IT IS SO ORDERED.**

Dated: June 18, 2024                                    */s/ Jennifer Dowdell Armstrong*
                                                        Jennifer Dowdell Armstrong
                                                        U.S. Magistrate Judge